1  Walter J. Lack, Esq. (SBN 57550)
   *wlack@elllaw.com*
2  Paul A. Traina, Esq. (SBN 155805)
   *ptraina@elllaw.com*
3  Ian P. Samson, Esq. (SBN 279393)
   *isamson@elllaw.com*
4  **ENGSTROM, LIPSCOMB & LACK**
   A Professional Corporation
5  10100 Santa Monica Boulevard, 12th Floor
   Los Angeles, California 90067-4113
6  Tel: (310) 552-3800 / Fax: (310) 552-9434

7  Brian J. Soo-Hoo, Esq. (SBN 228298)
   *soohoolaw@gmail.com*
8  **LAW OFFICES OF BRIAN J. SOO-HOO**
   601 Parkcenter Drive, Suite 105
9  Santa Ana, California 92705-3543
   Tel: (714) 589-2252/Fax: (714) 589-2254
10

11 Attorneys for Plaintiff and the Proposed Class

12

13                 **UNITED STATES DISTRICT COURT**

14                 **CENTRAL DISTRICT OF CALIFORNIA**

15 PHILLIP NGHIEM, individually and          Case No.:  8:16-cv-00097
   on behalf of a class of similarly         Assigned to Hon. Cormac J. Carney
16 situated individuals,
17                                            **PLAINTIFF'S OPPOSITION TO**
                        Plaintiff,            **DEFENDANTS' MOTION TO**
18                                            **COMPEL ARBITRATION AND STAY**
              v.                              **LITIGATION OR, IN THE**
19                                            **ALTERNATIVE, FOR DISCOVERY**
   DICK'S SPORTING GOODS, INC.,               **ON THE ISSUE OF ARBITRABILITY**
20 ZETA INTERACTIVE
   CORPORATION, and DOES 1-10,
21                                            Date:     July 11, 2016
                        Defendants.           Time:     1:30 p.m.
22                                            Place:    Courtroom 9B
23
24
25
26                                            Complaint Filed:  January 22, 2016
27 ///
28 ///

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................... 1

II.    FACTUAL BACKGROUND .................................................................. 2

III.   ARGUMENT .......................................................................................... 4

      A.     Plaintiff Did Not Agree to Arbitration ....................................... 5

           1.   DSG's Terms of Use Is a Browsewrap Agreement and Thus Only Enforceable If Plaintiff Had Actual or Constructive Knowledge of Its Terms ........................... 6

           2.   Plaintiff Did Not Have Actual or Constructive Knowledge of the Terms of Use ..................................... 7

                a.   Plaintiff Did Not Have Actual Knowledge .......................... 7

                b.   Defendants Cannot Show Constructive Knowledge ................................................................. 10

                c.   Defendants' Novel Version of "Inquiry Notice" Is Incorrect ............................................... 14

      B.     The TOU Does Not Apply to Plaintiff's Claims ........................ 16

           1.   Plaintiff's Claims Are Not "Related" to DSG's Website ..................................................... 17

           2.   Plaintiff's Claims Arose After He Terminated His Relationship with DSG ................................... 20

      C.     Zeta's Attempt to Enforce the Arbitration Agreement Fails ................. 22

           1.   Zeta's Equitable Estoppel Arguments Fail .................... 23

           2.   Zeta Is Not an Intended Third Party Beneficiary ......................... 24

      D.     Defendants Fail to Demonstrate Good Cause to Modify the Court's Scheduling Order and Limit Discovery to "Arbitrability" ....................................................................... 25

IV.    CONCLUSION ................................................................................... 25

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Alea London Ltd. v. Am. Home Servs., Inc.*,
   638 F.3d 768 (11th Cir. 2011) ................................................................... 14

*Ashbey v. Archstone Property Management, Inc.*,
   785 F.3d 1320 (9th Cir. 2015) .................................................. 4, 5, 10, 17

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ...................................................................................... 4

*Bair v. Manor Care of Elizabethtown, PA, LLC*,
   108 A.3d 94 (Pa. Super. 2015) ................................................................... 6

*Bridgemans Services Ltd. v. George Hancock, Inc.*,
   No. 14-CV-1714, 2015 WL 4724567 (W.D. Wash. Aug. 7, 2015) ......................... 16

*Britton v. Co-op Banking Group*,
   4 F.3d 742 (9th Cir. 1993) ......................................................................... 24

*Brown v. DirecTV, LLC*,
   No. CV 12–08382 DMG, 2013 WL 3273811 (C.D. Cal. Jun. 26, 2013)............... 21

*Cayanan v. Citi Holdings, Inc.*,
   928 F. Supp. 2d 1182 .................................................................................. 21

*Cline v. Chase Manhattan Bank, USA*,
   No. 07-CV-650, 2008 WL 4200154 (D. Utah Sept. 12, 2008) ........................... 9

*Comer v. Micor*,
   436 F.3d 1098 (9th Cir. 2006) ................................................................... 22

*Crawford v. Beachbody, LLC*,
   No. 14-CV-1583, 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) .......................... 13

*Cvent, Inc. v. Eventbrite, Inc.*,
   739 F. Supp. 2d 927 (E.D. Va. 2010) ......................................................... 11

*Dang v. Samsung Electronics Co., Ltd.*,
   No. 14-CV-00530-LHK, 2015 WL 4735520 (N.D. Cal. Aug. 10, 2015) ............... 16

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

*Davis v. O'Melveny & Myers*,
    485 F.3d 1066 (9th Cir. 2007) ................................................................ 18

*E.K.D. ex rel. Dawes v. Facebook, Inc.*,
    885 F. Supp. 2d 894 (S.D. Ill. 2012) ..................................................... 16

*Doe v. Princess Cruise Lines, Ltd.*,
    657 F.3d 1204 (11th Cir. 2011) ............................................................. 17

*Fagerstrom v. Amazon.com, Inc.*,
    No. 15-cv-96-BAS-DHB, 2015 WL 6393948 (S.D. Cal. Oct. 21, 2015) ............... 13

*Feldman v. Google, Inc.*,
    513 F. Supp. 2d 229 (E.D. Pa. 2007) .................................................... 16

*Fteja v. Facebook, Inc.*,
    841 F. Supp. 2d 829 (S.D.N.Y. 2012) ................................................... 13

*Geier v. m-Qube, Inc.*,
    -- F.3d ---, 2016 WL 3034064 (9th Cir. May 26, 2016) ..................... 24, 25

*Green Tree Fin. Corp.-Alabama v. Randolph*,
    531 U.S. 79 (2000) ................................................................................... 5

*Guadagno v. E*Trade Bank*,
    592 F. Supp. 2d 1263 (C.D. Cal. 2008) ............................................... 13

*Holcombe v. DirecTV, LLC*,
    No. 4:15–CV–0154–LMM, 2016 WL 526244 (N.D. Ga. Feb. 9, 2016) ............... 21

*Hubbert v. Dell Corp.*,
    359 Ill. App. 3d 976 (Ill. Ct. App. 2005) ............................................ 13

*In re Jiffy Lube Intern., Inc. Text Spam Litig.*,
    847 F. Supp. 2d 1253 (S.D. Cal. 2013) ................................................ 18

*In re Zappos.com*,
    893 F. Supp. 2d 1058 (D. Nev. 2012) .................................................. 11

*Knutson v. Sirius XM Radio Inc.*,
    771 F.3d 559 (9th Cir. 2014) ................................................. 4, 6, 8, 17

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

*Koch Indus., Inc. v. Does*,
    No. 10-CV-1275, 2011 WL 1775765 (D. Utah May 9, 2011) ................................. 11

*Leventis v. AT&T Advert. Sols.*,
    No. 3:11-CV-03437, 2012 WL 931081 (D.S.C. Mar. 19, 2012) ............................ 16

*Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*,
    501 U.S. 190 (1991).................................................................................20, 21, 22

*Long v. Provide Commerce, Inc.*,
    245 Cal. App. 4th 855 (2016) ...................................................................6, 7, 9, 10

*Lucas v. Hertz Corp.*,
    875 F. Supp. 2d 991 (N.D. Cal. 2012)..............................................................23, 24

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995).......................................................................................... 18

*McNamara v. Royal Bank of Scotland Group, PLC*,
    2012 WL 5392181 (S.D. Cal. Nov. 5, 2012).......................................................... 21

*Mundi v. Union Sec. Life Ins. Co.*,
    555 F.3d 1042 (9th Cir. 2009) ......................................................................... 23

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ....................................................................*passim*

*Nguyen v. Barnes & Noble, Inc.*,
    No. 8:12–cv–0812–JST, 2012 WL 3711081 (C.D. Cal. Aug. 28, 2012) .................. 9

*Nicoisa v. Amazon, Inc.*,
    84 F. Supp. 3d 142, 152-53 (E.D.N.Y. 2015)......................................................... 13

*PDC Labs., Inc. v. Hach Co.*,
    No. 09-1110, 2009 WL 2605270 (C.D. Ill. Aug. 25, 2009).................................... 13

*Rajagopalan v. NoteWorld, LLC*,
    718 F.3d 844 (9th Cir. 2013) ........................................................................23, 24

*Reeves v. Chase Bank USA, NA*,
    No. 07-CV-1101, 2008 WL 2783231 (E.D. Mo. Jul. 15, 2008) ............................. 9

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

*Sgouros v. TransUnion Corp.*,
    817 F.3d 1029 (7th Cir. 2016) ................................................................. 12

*Smith v. Steinkamp*,
    318 F.3d 775 (7th Cir. 2003) .................................................................. 17

*Sourcing Unlimited, Inc. v. Asimco Intern., Inc.*,
    526 F.3d 38 (1st Cir. 2008)...................................................................... 24

*Stark v. Gilt Groupe, Inc.*,
    No. 13-CV-5497, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ............................ 13

*Stinger v. Chase Bank, USA, NA*,
    265 Fed. Appx. 224 (5th Cir. 2008) ........................................................... 9

*Swift v. Zynga Game Network, Inc.*,
    805 F. Supp. 2d 904 (N.D. Cal. 2011) ........................................................ 13

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*,
    925 F.2d 1136 (9th Cir. 1991) ..........................................................*passim*

*U.S. v. Detroit Timber & Lumber Co.*,
    200 U.S. 321 (1906)................................................................................. 5

*U.S. ex rel. Giles v. Sardie*,
    191 F. Supp. 2d 1117 (C.D. Cal. 2000) ....................................................... 5

*Van Tassell v. United Mktg. Grp.*,
    795 F. Supp. 2d 770 (N.D. Ill. 2011) ......................................................... 11

*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford
    Junior University*,
    489 U.S. 468 (1989)................................................................................ 17

*Walters v. Chase Manhattan Bank*,
    No. 07-CV-0037, 2008 WL 3200739 (E.D. Wash. Aug. 6, 2008)............................ 9

*Zivkovic v. So. Cal. Edison Co.*,
    302 F.3d 1080 (9th Cir. 2002) ................................................................. 25

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

   This is Defendant Dick's Sporting Goods, Inc.'s ("DSG") second attempt to enforce an arbitration clause it and Defendant Zeta Interactive Corporation ("Zeta") argue applies to Plaintiff Phillip Nghiem's claims under the Telephone Consumer Protection Act ("TCPA").   There is a key difference on this go-around: Whereas before DSG refused to acknowledge that it sent the unconsented text messages at issue in Plaintiff's complaint, *see* DSG's Am. Answer (ECF No. 20) at ¶ 23, Defendants now come clean and admit that they sent unauthorized text messages to Plaintiff's wireless number.   *See* Mot. to Compel Arb. (ECF No. 47)   That conduct violates the TCPA and subjects Defendants to liability.

   No wonder, then, that Defendants seek any avenue to sidestep their clear liability.   Stumbling upon a website-based arbitration clause DSG has not used in similar TCPA matters, Defendants argue that Plaintiff must arbitrate his claims.   But Plaintiff never signed that agreement or otherwise manifested his assent; instead, it is a pure "browsewrap," which means that Defendants must show that Plaintiff had "actual or constructive knowledge" of its terms in order to compel arbitration.   *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178 (9th Cir. 2014).

   Defendants do not come close to either showing.   Although they baselessly insist to the contrary, the evidence is clear that Plaintiff did not have actual knowledge of the agreement.   It is also clear that DSG's website did not place users on inquiry notice of the arbitration clause.   Among other things, DSG's website contained an ***entirely separate*** "terms and conditions" page for the mobile alerts program, and ***nowhere in those "terms and conditions" does DSG mention arbitration or even link to the term of use Defendants now seek to enforce***.

   Nor does the arbitration clause—which is limited to disputes "relating in any way" to DSG's website—encompass Plaintiff's claims.   After all, this case concerns text messages sent to cellular phones, not anything online.   Yet, hoping to tie

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

1   Plaintiff's claims to DSG's website and overcome his testimony that he does not recall
2   whether he learned of the mobile alerts program from DSG's website or a third party
3   website, Defendants contend that DSG's website was the "*only place*" Plaintiff could
4   have learned how to enroll in the mobile alerts program when he did.  This is not true.
5   Not only was the enrollment information available on third-party websites at the time,
6   *DSG itself advertised the keyword Plaintiff used to enroll in the program on social*
7   *media years before Plaintiff's enrollment*.  Finally, Defendants' attempt to apply a
8   contract-based arbitration clause—particularly one without an express survival
9   clause—is illogical because *all* of the relevant conduct occurred *after* Plaintiff had
10   revoked his consent to receive messages.

11        Zeta's attempt to enforce the arbitration clause as a non-signatory is
12   independently meritless.  Rather than demonstrate an intent to benefit third parties
13   (required for Zeta's third party beneficiary theory), the agreement washes its hands of
14   anything third parties might do—hardly an intent to benefit.  Similarly, Plaintiff is not
15   "equitably estopped" because his claims have nothing to do with the TOU and it is
16   Defendants, and not Plaintiff, who attempt to enforce it.

17        Defendants' motion is legally and factually baseless.  It should be denied.

18   **II.    FACTUAL BACKGROUND**

19        DSG is a nationwide sporting goods retailer.  First Amended Complaint (ECF
20   No. 33) ("FAC") ¶ 9.  As part of the company's promotional efforts, it operates, in
21   conjunction with Zeta, a "mobile alerts" program by which it sends SMS text messages
22   directly to consumers' cell phones using automatic dialing technology.  *Id.* ¶ 18.

23        On or about February 20, 2015, Plaintiff enrolled in the DSG "mobile alerts"
24   program by texting the word "JOIN" to a short-code designated for DSG.  *Id.* ¶ 23.
25   Plaintiff learned of DSG's mobile alerts program when shopping online for athletic
26   shoes.  Declaration of Phillip Nghiem ("Nghiem Decl.") ¶ 6.  Plaintiff does not recall
27   whether he learned about the mobile alerts program from DSG's website or from a
28   third-party website.  *Id.*; Declaration of Ian Samson ("Samson Decl."), Ex. 3 at 9-12

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

(Deposition of Phillip Nghiem ("Nghiem Dep.") at 90:2-91:16, 96:22-97:22).  At that time, several third party sites contained the keyword "JOIN" and the relevant short code, *see* Samson Decl., Exs. 7 and 8, and ***DSG itself advertised the keyword "JOIN" on social media for years prior to Plaintiff's enrollment***.  *See id.*, Ex. 6; *compare with* Declaration of Patrick Daley ("Daley Decl.") ¶¶ 4-5 ("At the time Plaintiff enrolled in the Mobile Alerts program, DSG did not utilize … online display [or] social media … to advertise the keyword JOIN.  The only place the keyword JOIN was advertised or even disclosed in February, 2015 was on the DSG webpage…").

Using his cell phone, Plaintiff signed up for the mobile alerts program in the hopes of receiving a coupon or promotional offer he could use for the athletic shoes he wanted to buy.  Nghiem Decl. ¶ 6.  Ultimately, Plaintiff did not purchase athletic shoes from DSG or any other retailer because his brother bought them for him as a gift.  *Id.*

At no time prior to enrolling in DSG's "mobile alerts" program did Plaintiff read the "terms of use" contained on DSG's website, including the arbitration clause and class action waiver Defendants now seek to enforce.  *Id.* ¶ 9; Samson Decl., Ex. 3 at 13-14 (Nghiem Dep. at 108:7-109:21).  Plaintiff's enrollment was not conditioned on his assent to those terms—according to Patrick Daley, DSG's Director of Marketing Analytics who oversaw DSG's mobile alerts programs from February 2015 to the present, all Plaintiff had to do was text "JOIN" to be enrolled in the program.  Samson Decl., Ex. 1 at 2-5 (Deposition of Patrick Daley ("Daley Dep.") 11:13-17, 14:4-15:20, 51:8-15).  In fact, the first time Plaintiff learned of the arbitration clause and class action waiver was from his attorneys during the course of this litigation.  Nghiem Decl. ¶¶ 9-10, 13.

On or about December 6, 2015, Plaintiff terminated his participation in the DSG "mobile alerts" program by texting the word "stop" to DSG's short code.  FAC ¶ 24.  DSG instantaneously responded with the following message:

DSG Mobile Alerts: You have been unsubscribed and will no longer receive messages from us.  Reply HELP for help.  877-846-9997.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

1  *Id.*  Thereafter, DSG sent Plaintiff nine promotional text messages without Plaintiff's

2  consent.  *Id.* ¶ 25; *see also* Mot. at 1.  Mr. Daley estimated that there are anywhere

3  from 2,000 to 2,500 individuals who also received unconsented text messages in the

4  same manner as Plaintiff.  *See* Samson Decl., Ex. 1 at 6-7 (Daley Dep. at 84:16-85:7).

5  On January 22, 2016, Plaintiff filed the instant class action pursuant to the

6  TCPA.  On June 13, 2016, DSG filed the instant motion to compel arbitration.

7  **III.   ARGUMENT**

8  Defendants devote a substantial portion of their motion to explaining the binding

9  nature of arbitration under the Federal Arbitration Act and the "liberal policy" in its

10  favor, particularly after *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011).

11  There is no quarrel that, in the wake of *Concepcion*, arbitration agreements have

12  oftentimes barred class actions from the courthouse door.  But the "liberal policy"

13  Defendants describe must be balanced against "the fundamental principle that

14  arbitration is a matter of contract."  *Concepcion*, 563 U.S. at 339.  As a contract, the

15  "first principle" of arbitration is that "a party cannot be required to submit [to

16  arbitration] any dispute which he has not agreed so to submit."  *Three Valleys Mun.*

17  *Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1142 (9th Cir. 1991) (quoting

18  *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 648 (1986)).

19  Thus, when considering a motion to compel arbitration, a court determines "(1)

20  whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement

21  encompasses the dispute at issue."  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559,

22  564-65 (9th Cir. 2014).

23  As the parties seeking to compel arbitration, Defendants bear the burden to show

24  the existence of a valid agreement and, if one exists, that that agreement encompasses

25  Plaintiff's claims.  *See, e.g.*, *Ashbey v. Archstone Property Management, Inc.*, 785 F.3d

26  1320, 1323 (9th Cir. 2015).   Conversely, when considering a motion to compel

27  arbitration "which is opposed on the ground that no agreement to arbitrate had been

28  made between the parties," as Defendants' motion is, a court should "give to the

1   opposing party the benefit of all reasonable doubts and inferences that may arise."

2   *Three Valleys*, 925 F.2d at 1141 (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics*

3   *Co.*, 636 F.2d 51 (3d Cir. 1980)).  Here, that is Plaintiff, not Defendants.

4        Ignoring this authority, Defendants argue that Plaintiff must show that

5   arbitration should ***not*** be compelled.  *See* Mot., at 9 (citing *Green Tree Fin. Corp.-*

6   *Alabama v. Randolph*, 531 U.S. 79, 81 (2000)).  Defendants' reading of the law is

7   fundamentally incorrect.  Amazingly, despite tailoring other portions of their motion to

8   respond to Plaintiff's first opposition, Defendants ***still*** cite to the ***headnote syllabus***

9   prepared by the reporter in *Green Tree*, which (of course) "constitutes no part of the

10  opinion of the Court."  *See also U.S. v. Detroit Timber & Lumber Co.*, 200 U.S. 321,

11  337 (1906) ("[T]he headnote is not the work of the court, nor does it state its

12  decision.").  Perhaps confused by the headnote's terse discussion, Defendants badly

13  misread *Green Tree*, which applies where a party challenges an arbitration agreement

14  on grounds other than those presented here: lack of agreement to arbitrate the claims at

15  issue.  *See Green Tree*, 531 U.S. at 92 (holding that "where a party seeks to invalidate

16  an arbitration agreement ***on the ground that arbitration would be prohibitively***

17  ***expensive***, that party bears the burden of showing the likelihood of incurring such

18  costs" (emphasis added)).  Defendants bear the burden to show that a valid agreement

19  exists and that any such agreement encompasses the claims at issue, and any doubts

20  and reasonable inferences must be drawn in Plaintiff's favor.[1]  *Ashbey*, 785 F.3d at

21  1323; *Three Valleys*, 925 F.2d at 1141.

22       **A.**    **Plaintiff Did Not Agree to Arbitration**

23       As noted above, it is axiomatic that "a party cannot be required to submit to

24

25  [1] Prior to filing the instant motion, Defendants' counsel stated that they have
unspecified "evidence" related to Plaintiff that they would not share until after a
26  deposition initially scheduled for June 20, 2016 (the date of this opposition) because it
would be "strategically inappropriate."  *See* Samson Decl., ¶ 13.  Whatever
27  Defendants' "strategy," raising new facts and arguments in a reply brief is improper.
*See U.S. ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000).

28

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

arbitration any dispute which he has not agreed so to submit." *Knutson*, 771 F.3d at 565 (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)).   Courts thus require a showing of "mutual assent" before enforcing arbitration agreements.[2]  *Id.*   As explained below, Defendants cannot show that Plaintiff assented to the arbitration agreement.

### 1. DSG's Terms of Use Is a Browsewrap Agreement and Thus Only Enforceable If Plaintiff Had Actual or Constructive Knowledge of Its Terms

Defendants admit that DSG's Terms of Use ("TOU")—which contains the arbitration clause—is an online agreement.  As explained in *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014), upon which Defendants rely, online agreements come in "two flavors": "clickwrap" and "browsewrap."  A clickwrap agreement is one in which a user is actually presented with and must affirmatively assent to the agreement—say, checking a box stating "I agree"—before using the website or taking some other action (like completing a purchase).  *Id.* at 1175-76.  In light of the outward manifestation of assent, courts consistently enforce clickwrap agreements.  *Id.*

By contrast, a browsewrap agreement is not presented to consumers and does not require any affirmative manifestation of assent prior to use of the website.  It instead purports to bind consumers simply because they use the website.  *Id.* at 1176. Given the lack of outward manifestation of assent, courts have a "traditional reluctance

---

[2] Although the TOU contains a choice-of-law provision selecting Pennsylvania law, Defendants do not identify the state law they believes applies.  Unsurprisingly, both California and Pennsylvania law require mutual assent for contracts.  *See, e.g.*, *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 862 (2016) ("[M]utual manifestation of assent … is the touchstone of contract." (citations omitted)); *Bair v. Manor Care of Elizabethtown, PA, LLC*, 108 A.3d 94, 98 (Pa. Super. 2015) ("Absent mutual assent, there [can be] no enforceable agreement to arbitrate.").  Plaintiff believes that California law should apply given that he did not agree to the TOU or the choice-of-law provision, but the result under either jurisdiction is the same.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

to enforce browsewrap agreements against individual consumers." *Id.* at 1178; *see also id.* at 1178 n.2 ("[C]ourts 'tend to shy away from enforcing browsewrap agreements that require no outward manifestation of assent.'" (citation omitted)). Instead, courts will enforce a browsewrap agreement ***only*** upon a showing of "actual or constructive knowledge of a website's terms and conditions." *Id.* at 1178 (citation omitted); *see also Long*, 245 Cal. App. 4th at 862 (same).

Against this backdrop, Defendants concede that the TOU is a browsewrap agreement. *See* Mot., at 11. Accordingly, in order to prevail on the present motion, Defendants must demonstrate that Plaintiff had "actual or constructive knowledge" of DSG's TOU and the arbitration clause.

### 2. Plaintiff Did Not Have Actual or Constructive Knowledge of the Terms of Use

#### a. Plaintiff Did Not Have Actual Knowledge

To support their contention that Plaintiff had actual knowledge of the TOU and arbitration clause, Defendants disingenuously contend—without any factual support— that, prior to joining the text message program, Plaintiff "exhaustively reviewed" DSG's website, including the TOU, and became familiar with its content. *See* Mot., at 7. But as Plaintiff testified at his deposition and has declared here, he did not investigate DSG's website, carefully or otherwise, prior to enrollment in the mobile alerts program. *See* Samson Decl., Ex. 3 at 13-14 (Nghiem Dep. at 108:7-109:21); Nghiem Decl. ¶¶ 9-10, 13, 16. In fact, the first time Plaintiff even learned of the existence of DSG's arbitration clause was when he was informed by his counsel in this case. *See* Nghiem Decl. ¶ 9. The testimony straight from the horse's mouth could not be clearer: Plaintiff did not have knowledge of the arbitration agreement Defendants now seek to enforce until his attorneys told him about it in this litigation.

Notwithstanding Plaintiff's testimony, Defendants insist that Plaintiff became familiar with the TOU through his law firm's investigation of DSG's mobile alerts programs, including that operated by Golf Galaxy. Defendants are again wrong.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

1   Plaintiff did not work on any matter at his law firm involving DSG or Golf Galaxy,
2   and did not do any of the things Defendants claim, such as "exhaustively review"
3   DSG's website. *See* Samson Decl., Ex. 3 at 13-14 (Nghiem Dep. at 108:7-109:21);
4   Nghiem Decl. ¶¶ 9-10, 13, 16. Not one of the letters Defendants point to in support of
5   this argument was signed by Plaintiff. Tellingly, Defendants present no evidence that
6   DSG even raised arbitration in response to these demands. To the contrary, Elizabeth
7   Baran, DSG's Assistant General Counsel and member of its legal department since
8   2010, could not identify a single instance in which DSG had invoked its arbitration
9   clause in response to a TCPA claim. *See* Samson Decl., Ex. 2 at 2-5, 9-10 (Baran Dep.
10  at 6:23-7:4, 11:3-6, 11:24-12:7, 111:18-112:25). That begs an important question: If
11  DSG wasn't thinking about its arbitration clause, why would it expect anyone else to?

12      No surprise, then, that Ms. Baran, who has overseen this litigation from the time
13  Plaintiff filed his complaint, candidly admitted at her deposition that Defendants'
14  contentions about Plaintiff—his purported "exhaustive review" and familiarity with the
15  TOU, etc.—are simply DSG's "belief" about actions Plaintiff ***might*** have taken. *See*
16  *id.* at 11-13 (Baran Dep. at 122:9-124:8). Ms. Baran further admitted that she "simply
17  do[es] [not] know" whether "[Plaintiff] as a [DSG] consumer … also had exposure to
18  DSG's website" because she does not "know what [Plaintiff's] practices were." *Id.*
19  Defendants' wild guesses are woefully insufficient to carry their burden, and simply
20  cannot withstand scrutiny when compared with Plaintiff's sworn testimony.

21      Unable to overcome the truth, Defendants ask the Court to disregard Plaintiff's
22  testimony as "self-serving." Defendants' invitation should be declined. Contrary to
23  Defendants' insistence, courts in the Ninth Circuit have long looked to a plaintiff's
24  testimony where mutual assent to arbitrate is at issue. *See, e.g.*, *Knutson*, 771 F.3d at
25  563 (declining to enforce arbitration agreement based, *inter alia*, on plaintiff's
26  statement that "I did not realize that there was [an arbitration] clause in the Customer
27  Agreement until my attorneys so informed me"). That is particularly true for
28  "browsewrap" agreements—after all, the plaintiff's testimony is highly probative

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

1    because his or her actual knowledge is at issue.  In fact, in the opinion *Nguyen*

2    affirmed, Judge Staton specifically noted that a court may "consider evidence outside

3    of the pleadings, such as declarations," and considered a declaration the plaintiff

4    submitted disclaiming any actual knowledge of the defendant's browsewrap

5    agreement.  *See Nguyen v. Barnes & Noble, Inc.*, No. 8:12–cv–0812–JST, 2012 WL

6    3711081, at *2 (C.D. Cal. Aug. 28, 2012) (Staton, J.) (citation omitted); Samson Decl.,

7    Ex. 4 (*Nguyen* plaintiff's declaration); *see also Long*, 245 Cal. App. 4th at 860

8    (affirming denial of motion to compel arbitration based in part on the plaintiff's

9    declaration that he was unaware of the arbitration agreement at issue).

10           Defendants' page-long string cite, *see* Mot. at 20-21, does not compel a different

11   result.  None of the cases Defendants cite involve Internet-based contracts, let alone

12   "browsewrap" agreements.  Instead, all of those cases relate to the same defendant

13   (Chase Bank) and terms and conditions for credit cards or bank accounts that Chase

14   Bank indisputably ***provided*** to the respective plaintiffs ***by mail***.  *See Stinger v. Chase*

15   *Bank, USA, NA*, 265 Fed. Appx. 224, 225 (5th Cir. 2008) ("[W]hen Chase sent [the

16   plaintiff] his credit card for each account, it also sent him [the agreement] that

17   established the terms of each account."); *Cline v. Chase Manhattan Bank, USA*, No.

18   07-CV-650, 2008 WL 4200154, at *7 (D. Utah Sept. 12, 2008) (same); *Walters v.*

19   *Chase Manhattan Bank*, No. 07-CV-0037, 2008 WL 3200739, at *3 (E.D. Wash. Aug.

20   6, 2008) (same); *Reeves v. Chase Bank USA, NA*, No. 07-CV-1101, 2008 WL

21   2783231, at *4 (E.D. Mo. Jul. 15, 2008) (same).   While Defendants may have

22   definitively shown the enforceability of Chase Bank's arbitration clause, they do not

23   explain why cases about mailed terms are applicable to DSG's TOU.  This failure is

24   especially glaring in light of Mr. Daley's admission that, unlike Chase, DSG did not

25   provide a copy of the TOU to anyone in the mobile alerts program.  *See* Samson Decl.,

26   Ex. 1 at 11 (Daley Dep. at 104:12-19).

27           Of course, it is one thing for a party to claim that he or she did not read, and

28   therefore cannot be bound, by a contract he or she unquestionably received and had the

opportunity to review—that is the point made by the four Chase Bank cases Defendants cite.  But it is quite another where, as here, the party to be bound has no idea the agreement purportedly exists in the first place and is never provided with a copy.  *Nguyen* makes this exact point, stating: "While failure to read a contract before agreeing to its terms does not relieve a party of its obligations … ***the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.***"  763 F.3d at 1179 (emphasis added).  Defendants' attempt to equate the two opposite propositions not only runs contrary to *Nguyen*; it lacks common sense.

### b.  Defendants Cannot Show Constructive Knowledge

Constructive knowledge "turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract."  *Nguyen*, 763 F.3d at 1177.  *Nguyen* instructs that "[w]hether a user has inquiry notice of a browsewrap agreement … depends on the design and content of the website and the agreement's webpage."  *Id.*  Where a "link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement."  *Id.*  Thus, for browsewrap agreements, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers."  *Id.* at 1179; *see also Long*, 245 Cal. App. 4th at 867 (same).  Again, Defendants bear the burden to show a valid agreement.  *See Ashbey*, 785 F.3d at 1323.

Defendants argue that the TOU's accessibility through purportedly "conspicuous" "hyperlinks throughout DSG's website" is "enough to put Plaintiff on reasonable notice of the Terms of Use and arbitration clause."  *See* Mot., at 13.  Defendants' position is squarely at odds with *Nguyen*.  In that case, the defendant claimed that its placement of a hyperlink to its terms of use "in the bottom left corner" of its website, which was often in "close proximity to buttons a user must click on to complete an online purchase," was sufficient to "place a reasonably prudent user on constructive notice" of the arbitration clause contained within those terms.  The court

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

1   rejected this argument, holding that "***the proximity or conspicuousness of the***
2   ***hyperlink alone is not enough to give rise to constructive notice.***"   *Id.* at 1178
3   (emphasis added).  The court went on to explain its reasoning as follows:

4   > In light of the lack of controlling authority on point, and in keeping
5   > with courts' traditional reluctance to enforce browsewrap agreements
6   > against individual consumers, we therefore hold that where a website
7   > makes its terms of use available via a conspicuous hyperlink on every
8   > page of the website but ***otherwise provides no notice to users nor***
9   > ***prompts them to take any affirmative action to demonstrate assent***,
10  > even close proximity of the hyperlink to relevant buttons users must
11  > click on—without more—is insufficient to give rise to constructive
12  > notice.

13  *Id.* at 1178-79 (emphasis added).  That holding is consistent with several other cases
14  refusing to find constructive notice simply because a defendant's website contains
15  hyperlinks to the terms of use sought to be enforced.  *See, e.g.*, *In re Zappos.com*, 893
16  F. Supp. 2d 1058, 1064 (D. Nev. 2012) (refusing to enforce arbitration clause based on
17  constructive notice where "[t]he Terms of Use is inconspicuous, buried in the middle
18  to bottom of every Zappos.com webpage among many other links, and the website
19  never directs a user to the Terms of Use" because "[n]o reasonable user would have
20  reason to click on the Terms of Use, even those users who have alleged that they
21  clicked and relied on statements found in adjacent links, such as the site's 'Privacy
22  Policy'"); *Koch Indus., Inc. v. Does*, No. 10-CV-1275, 2011 WL 1775765, at *24-25
23  (D. Utah May 9, 2011) (finding there was no manifested assent where the "Terms of
24  Use ... were available only through a hyperlink at the bottom of the page, and there
25  was no prominent notice that a user would be bound by those terms."); *Van Tassell v.*
26  *United Mktg. Grp.*, 795 F. Supp. 2d 770, 793 (N.D. Ill. 2011) ("[Plaintiff's] failure to
27  scour the website for the Conditions of Use she had no notice existed does not
28  constitute assent."); *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 936–37 (E.D.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO**
**COMPEL ARBITRATION AND STAY LITIGATION**

Va. 2010) (declining to enforce "Terms of Use" where "link only appears on Cvent's website via a link buried at the bottom of the first page" and "users of Cvent's website are not required to click on that link, nor are they required to read or assent to the Terms of Use in order to use the website or access any of its content").

Defendants' showing of constructive notice is even flimsier than the failed showing offered by the defendant in *Nguyen*. Although Defendants label the TOU hyperlink as "conspicuous," it is buried along with ***twenty-eight*** others in the ***exact same size and font***, including hyperlinks for unrelated matters like "Corporate Purchases" and "Commercials & Films." *See* Samson Decl., Ex. 5; Declaration of Todd Kelly ("Kelly Decl."), Ex. A. And beside the hyperlink, there is no "notice to users" about the TOU. *Id.* Under *Nguyen*, the facts do not give rise to inquiry notice.

Moreover, Defendants admit that, at the time Plaintiff enrolled, DSG's website contained an ***entirely separate*** "terms and conditions" for the mobile alerts program, and ***that neither that page nor the mobile alerts "sign up" page reference arbitration or even contain a hyperlink to the TOU.*** *See* Kelly Decl., Exs. B and C; *see also* Samson Decl. ¶ 12. That is not surprising; after all, Mr. Daley testified that neither he nor his team ever discussed the arbitration agreement in connection with the mobile alerts program, and Ms. Baran conceded that she knew of no instance in which DSG attempted to enforce the arbitration clause in a TCPA matter. *See* Samson Decl., Ex. 1 at 8-10 (Daley Dep. at 90:8-91:14, 93:5-12), Ex. 2 at 9-10 (Baran Dep. at 111:18-112:25). If anything, DSG's presentation of the "terms and conditions" for its mobile alerts program without mentioning arbitration "actively misleads" consumers and is yet another reason to decline arbitration in this case. *See, e.g.*, *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) (declining to enforce arbitration agreement where "[n]o reasonable person" would think that they were agreeing to arbitration given the disclosures made). Thus, ***the location Defendants (falsely) claim is the "only place" to obtain enrollment information for the mobile alerts program does not even contain reference to the TOU or arbitration.*** At best, this destroys inquiry

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

notice; at worst, it actively misleads consumers.  Either way, Defendants' efforts to show constructive knowledge are meritless.

None of the authority Defendants cite compels a different result—or even discusses a similar browsewrap agreement enforced by a court.  Instead, the authority concerns clickwrap agreements, "hybrid" browsewrap-clickwrap agreements not relevant here, or other instances where the website provides "explicit textual notice" of the terms—*e.g.*, "By checking this box, you agree to the terms and conditions"— sought to be enforced separate from merely linking to them at the bottom of the page. *See Nicoisa v. Amazon, Inc.*, 84 F. Supp. 3d 142, 152-53 (E.D.N.Y. 2015); *Fagerstrom v. Amazon.com, Inc.*, No. 15-cv-96-BAS-DHB, 2015 WL 6393948, at *12 (S.D. Cal. Oct. 21, 2015) (appeal filed on Nov. 20, 2015); *Crawford v. Beachbody, LLC*, No. 14-CV-1583, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014); *Stark v. Gilt Groupe, Inc.*, No. 13-CV-5497, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 838 (S.D.N.Y. 2012); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011); *Guadagno v. E*Trade Bank*, 592 F. Supp. 2d 1263, 1267 (C.D. Cal. 2008); *Hubbert v. Dell Corp.*, 359 Ill. App. 3d 976, 984 (Ill. Ct. App. 2005).  That includes *PDC Labs., Inc. v. Hach Co.*, No. 09-1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009), which *Nguyen* discussed and distinguished based on the "admonition" provided by the website to "review terms" and because the court's analysis was based on procedural unconscionability, not contract formation.  *See Nguyen*, 763 F.3d at 1178.  Not one of the cases Defendants cite supports their constructive knowledge argument.

Accordingly, DSG's website (1) only contains reference to the TOU in a non-distinct hyperlink buried with twenty-eight others at the bottom of the page; (2) does not require users to assent to the TOU or arbitration clause as a condition of enrollment in the mobile alerts program or even advise them of the TOU's existence; (3) presents users with a mobile alerts "sign up" page that does not mention arbitration nor link to the TOU; and (4) provides an ***entirely separate*** "terms and conditions" for the mobile

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

alert program that also does not mention arbitration nor link to the TOU.  All of these facts demonstrate that Defendants' inquiry notice arguments fail.

> ### c.   Defendants' Novel Version of "Inquiry Notice" Is Incorrect

Unable to demonstrate constructive notice, Defendants attempt to distract from their failure by raising a series of unsubstantiated and irrelevant contentions about Plaintiff under the guise of "inquiry notice."  Defendants miss the point.  The question is whether a website "put users on notice of the terms," *see Nguyen*, 763 F.3d at 1177, not the individual "sophistication" of users who may encounter that site.  As a result, the *Nguyen* court rejected a similar argument—a much stronger one, considering that the plaintiff there had a browsewrap agreement ***on his own website***!—as "of no moment," holding that the plaintiff's other experiences had "no bearing on whether he had constructive notice of [defendant's] Terms of Use."  *Id.* at 1179.

Undeterred by *Nguyen*'s instruction, Defendants first argue that Plaintiff's participation in other text message programs puts him on "inquiry notice" of DSG's arbitration clause.[3]  Defendants never connect the (several) dots between those two tangential positions to explain how Plaintiff's enrollment in another company's program would put him on inquiry notice of an arbitration clause contained on DSG's website.[4]  The closest Defendants come is their bizarre and nonsensical argument that

---

[3] Defendants' suggestion that Plaintiff concealed other text message programs in which he had enrolled at his deposition is wrong.  Plaintiff named all of the programs he could remember.  *See* Samson Decl., Ex. 3 at 5-6 (Nghiem Depo. at 52:19-53:9); Nghiem Decl. ¶ 7.  Plaintiff never represented that they were the entirety of the programs in which he enrolled—in fact, he was never asked that simple follow-up question.  *Id.*  Defendants cannot blame Plaintiff for their counsel's failure to ask questions at his deposition.

[4] Defendants also repeatedly contend—without any factual support—that Plaintiff joined the DSG mobile alerts program to "hunt" for a lawsuit.  Although that is not why Plaintiff enrolled, *see* Nghiem. Decl. ¶ 8, even assuming Defendants were correct about Plaintiff's motivations: So what?  Defendants never connect Plaintiff's supposed motivations to DSG's arbitration clause.  What's more, the TCPA is essentially a strict liability statute, *see Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776

---

> **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO**
> **COMPEL ARBITRATION AND STAY LITIGATION**

Plaintiff was supposedly "too busy enrolling in text programs" to "visually inspect DSG's Terms of Use" and is therefore on "inquiry notice." *See* Mot., at 8. Other than that, Defendants devolve into schoolyard-style taunting of Plaintiff's mundane purchases; these attacks are pitifully ironic, considering that Defendants either use a mobile alerts program to market products (DSG) or operate mobile alerts programs for multiple clients (Zeta). Defendants' argument is a red herring.

Defendants also argue that, because he is an attorney, Plaintiff must be held to a different standard than other consumers with respect to notice of DSG's TOU. As explained, Plaintiff's relevant experiences as an attorney are limited, *see* Nghiem Decl. ¶ 15, but that is beside the point. Whether he is an attorney or not does not change the fact that Plaintiff was unaware of DSG's arbitration clause until his attorneys informed him during this case. *Id.* ¶ 9. While Plaintiff's employment as an attorney might be relevant had he claimed that he did not understand **what** the TOU **meant**, such an argument is irrelevant to **whether** DSG met **its burden** to "put users on notice of the terms to which [DSG] wish[es] to bind consumers." *Nguyen*, 763 F.3d at 1179.

Defendants cite no case for the limitless principle they advocate: An attorney is bound to any browsewrap agreement simply by virtue of being an attorney because he or she should recognize that "terms of use" contains unspecified "legal obligations."[5] *See* Mot., at 13. But as Defendants tell it, anyone deemed sufficiently "sophisticated" is bound to terms otherwise insufficient to give rise to inquiry notice simply because that sophisticated person is aware that such terms **could** exist. That is the opposite of *Nguyen*'s holding and should be rejected.

---

(11th Cir. 2011), and Defendants point to no authority insulating them from liability simply because the recipient of unauthorized text messages wanted to bring a lawsuit. Defendants' argument has no relevance to this motion or any claim in this case.

[5] This argument also presumes that Plaintiff actually visited DSG's website, but whether he did so is disputed. *See infra* Section III.B.1.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

Repeating a now-familiar pattern, Defendants misunderstand the authority they cite in support of their meritless argument.  Like the Chase Bank cases discussed above, *Dang v. Samsung Electronics Co., Ltd.*, No. 14-CV-00530-LHK, 2015 WL 4735520, at *5-6 (N.D. Cal. Aug. 10, 2015) is completely irrelevant because it involved a "shrinkwrap" agreement: a ***physical*** contract that the plaintiff ***admittedly received*** along with the wireless device at issue.  Also irrelevant is *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 896 (S.D. Ill. 2012), which dealt with a hybrid clickwrap-browsewap not applicable here.  In *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 241 (E.D. Pa. 2007), which concerned a clickwrap agreement, the court found that the attorney's sophistication was relevant to procedural unconscionability, not the formation of an agreement—a key distinction also made by *Nguyen*.  *See Nguyen*, 763 F.3d 1178.  *Leventis v. AT&T Advert. Sols.*, No. 3:11-CV-03437, 2012 WL 931081, at *5-6 (D.S.C. Mar. 19, 2012) concerned a physical contract "summary" signed by an attorney who tried to avoid the detailed terms by claiming he never read them.  As a result, the court considered an attorney's "sophistication" insofar as the attorney understood the terms of the deal; it did not consider whether an agreement existed because the attorney indisputably signed the document.  The facts of *Bridgemans Services Ltd. v. George Hancock, Inc.*, No. 14-CV-1714, 2015 WL 4724567, at *1-2 (W.D. Wash. Aug. 7, 2015) are nearly identical to *Leventis*, and the court unsurprisingly reached a similar result.

As such, none of these cases stand for Defendants' backwards inquiry notice analysis.  Defendants' attempt to subvert *Nguyen* and distract from DSG's failure to place consumers—particularly participants in the mobile alerts program—on reasonable notice of the TOU is meritless.

## B.    The TOU Does Not Apply to Plaintiff's Claims

Defendants' efforts to enforce DSG's arbitration clause fail for an additional reason: Even if Plaintiff had agreed to the TOU (which he did not), Plaintiff's claims are not encompassed by the arbitration clause.  Plaintiff concurs with Defendants that,

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

in addition to determining "whether a valid agreement to arbitrate exists," a court faced with a motion to compel arbitration must determine "whether the agreement encompasses the dispute at issue." *Knutson*, 771 F.3d at 564-65; *see also* Mot., at 8. Defendants bear the burden for this showing, *see Ashbey*, 785 F.3d at 1323, and all "reasonable doubts and inferences" should be drawn in Plaintiff's favor, *see Three Valleys*, 925 F.2d at 1141.  Defendants cannot carry their burden.

### 1. Plaintiff's Claims Are Not "Related" to DSG's Website

Defendants devote a significant amount of time explaining how the language in DSG's arbitration clause is very broad and therefore encompasses Plaintiff's claims. *See* Mot., at 15.  While it is true that courts may give broad construction to arbitration agreements, that principle is not limitless.  *See Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003) (refusing to enforce arbitration clause where "absurd results ensue"). At the same time, it is axiomatic that courts should interpret arbitration agreements "in accordance with their terms." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 478 (1989).

Defendants fundamentally misread the agreement they now seek to enforce. While Defendants argue that the TOU applies to every conceivable interaction DSG could have with consumers (even in-store!), they ignore the fact that the ***arbitration clause*** is ***specifically limited*** to claims "relating in any way to your visit to or interaction with [DSG's website]."  *See* Declaration of Rebecca Lutz ("Lutz Decl."), Ex. A at 6.  As another court has recognized, the phrase "related to" "marks a boundary by indicating some direct relationship; otherwise, the term would stretch to the horizon and beyond." *See Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011).  Thus, Defendants must demonstrate a direct relationship between DSG's website and Plaintiff's claims.

Dissatisfied with the narrow scope of an agreement DSG wrote, Defendants urge the Court to rewrite DSG's clause and apply it to any claim existing "but for" or which

412830

17

8:16-cv-00097

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

"touches upon" the "relationship" between DSG and consumers.[6]  *See* Mot., at 15-16. Courts may not rewrite arbitration agreements, *see Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1084 (9th Cir. 2007), and none of the terms Defendants claim control the analysis are found anywhere within the TOU.  Defendants can hardly complain about the language of a contract that DSG drafted—and, for that matter, that Plaintiff did not know about until his attorneys told him in this case.  *See, e.g., Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) ("[A] common-law rule of contract interpretation [is] that a court should construe ambiguous language against the interest of the party that drafted it.").  Defendants' attempts to expand the scope of the arbitration clause fall flat.

Defendants ultimately recognize that they must show a direct relationship between the unconsented text messages they sent to Plaintiff and DSG's website.  But Plaintiff could not recall whether he learned of the mobile alerts program by visiting DSG's website or a third-party site, *see* Samson Decl., Ex. 3 at 9-12 (Nghiem Dep. at 90:2-91:16, 96:22-97:22); Nghiem Decl. ¶ 6, and that doubt must be drawn in his favor.  Hoping to overcome this doubt, Defendants repeatedly state that "Plaintiff must have visited and navigated [DSG's] website" because that was purportedly "the ***only*** place where DSG's mobile alerts program was discussed, and the ***only*** place where the enrollment short code number and "JOIN" code used by Plaintiff were revealed."[7]  *See*

---

[6] Courts in this circuit have rejected the "but for" analysis Defendants now advocate for TCPA cases—*e.g.*, "but for" providing a phone number, the company would not have been able to place unconsented calls.  *See, e.g., In re Jiffy Lube Intern., Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253, 1263 (S.D. Cal. 2013) ("Though it seems likely that [the plaintiff] provided his telephone number when signing the contract, it is unclear that later use of that number to commit a tort can be said to relate to the contract… The existence of the original contract may have been the 'but for' cause of the alleged TCPA violation, ***but this alone is not necessarily enough to establish that the claim arises out of or relates to the contract.***" (emphasis added)).

[7] There is another problem with Defendants' argument: The linchpin page to which they cite—Exhibit B to the Kelly Declaration—is not even a page from DSG's

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

1  Mot. at 12 (emphasis in original).   To make these statements, Defendants rely

2  exclusively on Mr. Daley's declaration.

3        Mr. Daley's testimony and Defendants' statements about it can only be fairly

4  characterized as outright misrepresentations.   Even a cursory Google search reveals

5  that DSG's mobile alerts program, the short code, and the keyword "JOIN" were all

6  "discussed" and "revealed" on websites other than DSG's website in February 2015.

7  *See* Samson Decl., ¶ 10, Exs. 6-8.   Most disturbingly, in a nearly five-year-old

8  advertisement still available today on Facebook, a well-known social media website,

9  ***DSG itself "discussed" the mobile alerts program and "revealed" the short code and***

10 ***keyword "JOIN."***   *See id.*, Ex. 6.   Mr. Daley's testimony that "DSG did not utilize …

11 online display [or] social media … to advertise the keyword 'JOIN'" or that "[t]he

12 only place that the keyword JOIN was advertised or even disclosed in February, 2015

13 was on the DSG webpage," *see* Daley Decl., ¶¶ 4-5, is ***just not true***.

14       Defendants' insistence that Plaintiff "must have" visited DSG's website is

15 wholly lacking in factual basis.   Moreover, the relative ease with which Plaintiff

16 uncovered this misrepresentation highlights a problem with Defendants' credibility: If

17 Mr. Daley wasn't telling the truth about an advertisement accessible by a quick Google

18 search, how can he be relied upon to say whether there are other instances that existed

19 in February 2015 that have since been deleted or are otherwise unavailable today?

20 These doubts must be resolved in Plaintiff's favor.   *Three Valleys*, 925 F.2d at 1141.

21       Beyond wholly undermining Defendants' credibility, these examples bolster

22

23 website.   *See* Kelly Decl., Ex. B (URL is listed as "http://www.m3mobile.com," rather

24 than "http://www.dickssportinggoods.com").   This is not a minor detail.   The TOU

25 Defendants seek to enforce ***specifically disclaims*** its applicability to websites other

26 than DSG's website.   *Compare* Lutz Decl., Ex. A at 4 (under the header "Third Party

27 Links" the TOU states: "If you use [third party] links, you will leave the Site.") *with*

28 *id.*, Ex. A at 6 (arbitration clause is applicable only to claims "relating in any way" to
   DSG's website).   Defendants do not explain why DSG's arbitration clause would apply
   to another website, particularly where the TOU itself disclaims any such applicability.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO**
**COMPEL ARBITRATION AND STAY LITIGATION**

1  Plaintiff's testimony—and allow the Court to draw a reasonable inference, *see id.*—

2  that he may have learned of the mobile alerts program and the "JOIN" keyword

3  through a third-party site rather than DSG's website.  *See* Samson Decl., Ex. 3 at 9-12

4  (Nghiem Dep. at 90:2-91:16, 96:22-97:22); Nghiem Decl. ¶ 6.  Again, that doubt

5  should be resolved in Plaintiff's favor.  *Three Valleys*, 925 F.2d at 1141.  Moreover,

6  the facts demonstrate that Plaintiff's claims are entirely "related" to DSG's

7  unconsented text messages, not DSG's website.[8]  Plaintiff used his mobile device and

8  his wireless number to join DSG's mobile alerts program, to revoke his consent, and to

9  receive DSG's acknowledgement of his revocation and unauthorized text messages.

10  Granting even the broadest possible construction, none of this conduct is "relat[ed] in

11  any way" to DSG's website.  By its own terms DSG's arbitration clause is not

12  applicable to Plaintiff's claims, and the Court should decline Defendants' invitation to

13  blue pencil terms DSG wrote.

14         **2.    Plaintiff's Claims Arose After He Terminated His Relationship**

15               **with DSG**

16         Defendants' argument fails for an additional reason: All of Plaintiff's claims

17  arose ***after*** he terminated any "relationship" with Defendants and are therefore outside

18  the scope of the arbitration clause Defendants seek to enforce.  Defendants correctly

19  recognize that *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, 501

20  U.S. 190 (1991) controls the analysis, and that the Supreme Court there instructed:

21         A postexpiration grievance can be said to arise under the contract only

22         where it involves facts and occurrences that arose before expiration,

23         where an action taken after expiration infringes a right that accrued or

24  

25  [8] Defendants also repeatedly state that "Plaintiff … enrolled in the Text Alerts program

26  on DSG's website."  *See, e.g.*, Mot. at 17.  Whether careless or intentional, this is a

27  misstatement.  Plaintiff did not enroll "on DSG's website," but instead texted the

28  keyword "JOIN" using his cellular phone.  Even Defendants' declarant admits this

    fact.  *See* Declaration of Michael Meyer ¶ 6.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO**
**COMPEL ARBITRATION AND STAY LITIGATION**

vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

*Id.* at 205-06.

Of course, Plaintiff did not agree to the arbitration clause in the first place, but assuming for the sake of argument that he did, application of the *Litton* factors demonstrates that Plaintiff's claims are outside of that clause. As explained above, the facts and occurrences giving rise to Plaintiff's claims all arose after termination of the parties' relationship. Similarly, Plaintiff's claims under the TCPA did not arise until after the parties' relationship had ended—by their nature, Plaintiff's claims necessarily involve conduct that occurred ***after*** Plaintiff's revocation of consent and DSG's acknowledgement of it. Finally, there is no indication "under normal principles of contract interpretation" that a reasonable consumer intended to indefinitely bind himself or herself to arbitration. The TOU contains a termination clause that allows either the consumer or DSG to terminate the agreement at any time, *see* Lutz Decl., Ex. A at 7, and there is no language (including a survival clause) indicating that the arbitration clause survives termination. *See Holcombe v. DirecTV, LLC*, No. 4:15–CV–0154–LMM, 2016 WL 526244, at *5 (N.D. Ga. Feb. 9, 2016) (declining to apply arbitration agreement because, among other things, "there is no contention that the arbitration provision … survives [] termination").

The cases Defendants cite further bolster Plaintiff's position. That is because each unquestionably concerns facts and claims that arose ***before*** the termination of the parties' relationships. *See Cayanan v. Citi Holdings, Inc.*, 928 F. Supp. 2d 1182, 1207 *Brown v. DirecTV, LLC*, No. CV 12–08382 DMG, 2013 WL 3273811, at *5 (C.D. Cal. Jun. 26, 2013) (unpaid cable bill); *McNamara v. Royal Bank of Scotland Group, PLC*, 2012 WL 5392181, at *7 (S.D. Cal. Nov. 5, 2012) (outstanding credit card payments). By contrast, Plaintiff's claims have nothing to do with conduct that occurred during the time he was enrolled in the mobile alerts program and are therefore outside the scope

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

of the arbitration agreement.  This result is consistent with *Litton* and makes plain sense: Absent some agreement to be indefinitely bound to arbitrate any dispute that may arise after the parties have terminated their relationship, a court should decline to compel arbitration for post-expiration conduct.

Hoping to bring Plaintiff's claims within *Litton*, Defendants attempt to rewrite Plaintiff's complaint by arguing that "Plaintiff's grievance arises directly out of DSG's purported failure to comply with the terms of the parties' contract" and that "no intervening time, changed circumstances, or altered purpose" arose to alter the parties' relationship.  *See* Mot., at 19.  Defendants are wrong.  As an initial matter, none of Plaintiff's allegations depend upon the TOU, which is "contract" ***Defendants*** seek to enforce—in fact, as explained above, that document says nothing about the mobile alerts program, and Plaintiff was not required to assent to its terms as a condition of enrollment.  If there was any "contract" at all, then it is the entirely separate "terms and conditions" for the mobile alerts program. And rather than allege that Defendants "breached" that "contract," Plaintiff alleges that Defendants sent him text messages without his consent in violation of the TCPA.   Defendants' unsubstantiated explanation that they sent Plaintiff those messages because of a so-called "glitch"—an explanation Defendants do not even bother to support with a declaration—does not change the fact that this is ***not*** a breach of contract action, but a statutory action based on activity that arose after the parties ended their relationship.  Thus, Defendant's motion should be denied on this ground as well.

## C.  Zeta's Attempt to Enforce the Arbitration Agreement Fails

Even assuming the existence of a valid arbitration agreement—which Plaintiff disputes—Zeta would have no right to independently compel arbitration under any "ordinary contract and agency principles."  *See Comer v. Micor*, 436 F.3d 1098, 1102 (9th Cir. 2006) (citation omitted).  Zeta concedes that it is a nonsignatory to the agreement and identifies only two "contract and agency principles" it says allow it to enforce the arbitration clause: equitable estoppel and third party beneficiary.  Both fail.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO**
**COMPEL ARBITRATION AND STAY LITIGATION**

1

### 1.    Zeta's Equitable Estoppel Arguments Fail

2

To enforce an arbitration clause as a nonsignatory against a signatory under the
3 doctrine of equitable estoppel, Zeta has the burden to show: (1) that Plaintiff's claims
4 in this dispute are "intertwined with the contract providing for arbitration" and (2) that
5 Zeta's relationship with DSG was "of a nature that justifies a conclusion that the party
6 which agreed to arbitrate with another entity should be estopped from denying an
7 obligation to arbitrate a similar dispute with the adversary which is not a party to the
8 arbitration agreement." *See Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046
9 (9th Cir. 2009).   Importantly, in *Mundi*, the court rejected a third party's "equitable
10 estoppel" argument on the ground that the plaintiff's claims had nothing to do with the
11 contract that contained the arbitration agreement the third party sought to enforce. *Id.*
12 at 1047.   Zeta's argument fails for the same reason: Plaintiff's claims are not
13 "intertwined" with the TOU, but exist entirely independent from it.

14

No part of Plaintiff's case depends upon the TOU.  Plaintiff has never sought to
15 enforce any part of the TOU nor pled any portion of it in his complaint.  Plaintiff was
16 not required to assent to the TOU as a condition of enrollment in the mobile alerts
17 program.  In fact, the TOU never mentions the mobile alerts program.  Instead, the
18 "terms and conditions" for that program are contained in an ***entirely separate***
19 agreement that does not mention arbitration or even provide a hyperlink to the TOU.
20 *See infra*, Section III.A.2.b. There is simply no connection between Plaintiff's claims
21 and the TOU.  *See Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847-48 (9th Cir.
22 2013) (refusing to apply equitable estoppel theory to compel arbitration where the
23 plaintiff did not "contend that [any party] breached the terms of the contract" but
24 instead brought "statutory claims that are separate from the [ ] contract itself").

25

*Lucas v. Hertz Corp.*, 875 F. Supp. 2d 991 (N.D. Cal. 2012) does not help Zeta.
26 There, the court found that a Hertz, a rental car company, could compel arbitration of a
27 plaintiff's personal injury claim under its affiliate's arbitration clause.  *Id.* at 1003.
28 Because the plaintiff's personal injury claim only arose because he had rented the car

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

from the affiliate, the court compelled arbitration because the plaintiff "would not have been able to rent the car—and thus would not have had any relationship with Hertz—without signing the rental agreement." *Id.*; *see also Sourcing Unlimited, Inc. v. Asimco Intern., Inc.*, 526 F.3d 38, 47 (1st Cir. 2008). But unlike the plaintiff in *Lucas*, Plaintiff's enrollment in the text message program was ***not conditioned on his assent to the TOU***. Plaintiff could—and did—enroll in the text message program without assenting to the TOU. *Lucas* does not support Zeta's argument, and Zeta does not explain why any other authority supports its position. Zeta's attempt to enforce the arbitration clause under equitable estoppel fails.

### 2.    Zeta Is Not an Intended Third Party Beneficiary

In order to enforce the arbitration agreement as a third party beneficiary, Zeta must show that "the parties to the contract intended to benefit a third party." *Britton v. Co-op Banking Group*, 4 F.3d 742, 745 (9th Cir. 1993). Thus, if the third party cannot show the contracting parties intended a benefit, "that third party has no rights under the contract." *Id.* Despite bearing the burden to make this showing, Zeta does little more than characterize its performance as more than "incidental" and bemoan the fact that DSG did not condition enrollment in the mobile alerts program on assent to the TOU. As in *Britton*, Zeta's conclusory assessments are insufficient to carry its burden.

Not that Zeta could make the showing even if it tried. Indeed, neither the facts nor Zeta's own authority support its hyperbolic assessment that "[i]f there ever was an intended third party beneficiary of an arbitration agreement, it would be Zeta." Mot., at 23. Plaintiff did not intend for Zeta to be a beneficiary—he did not even know about the TOU. *Cf. Rajagopalan*, 718 F.3d at 847 (declining third party beneficiary argument where they was "no evidence [plaintiff] intended" for a third party benefit). As in *Britton*, cited by Zeta, the TOU does not evidence any intent to benefit Zeta or, for that matter, any other third party. Unlike the agreement in *Geier v. m-Qube, Inc.*, --F.3d ---, 2016 WL 3034064, at *2 (9th Cir. May 26, 2016), which expressly applied to claims brought against the defendant ***and*** its suppliers, the only time the TOU

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

1  mentions third parties is to disclaim DSG's responsibility for anything that they do—
2  hardly evidence of an "intent to benefit" Zeta.  *See* Lutz Decl., Ex. A at 4.
3  Additionally, the TOU specifically limits its applicability to DSG's "Family of
4  Businesses," and Zeta is not a member of that "family."  *See* Samson Decl., Ex. 9.
5  Finally, nowhere in the TOU discloses Zeta as a "partner" or even generally describes
6  a class of intended beneficiaries.  *Cf. Geier*, 2016 WL 3034064, at *2 (terms state that
7  they apply to "company's suppliers" but do not define that term).  There is no evidence
8  that Zeta was a third party beneficiary.  Zeta may not enforce the arbitration clause.

9        **D.    Defendants Fail to Demonstrate Good Cause to Modify the Court's**
10              **Scheduling Order and Limit Discovery to "Arbitrability"**

11             As a last-ditch effort to further delay this case, Defendants request that the Court
12  order "phased discovery" on the issue of "the degree to which [Plaintiff] is familiar
13  with the TOU."  *See* Mot., at 11.  DSG made a nearly identical request in the parties'
14  Rule 26(f) report, but the Court's scheduling order rejected any phasing of discovery in
15  favor of a general discovery cut-off.  *See* ECF No. 31.  A scheduling order may only
16  be modified "upon a showing of good cause, *see Zivkovic v. So. Cal. Edison Co.*, 302
17  F.3d 1080, 1087 (9th Cir. 2002), and Defendants do not present any such showing.  No
18  amount of discovery will change the facts that Plaintiff did not have actual knowledge
19  of the TOU, that DSG's website does not place users on inquiry notice of those terms,
20  that Plaintiff's claims are not encompassed by those terms, or that Zeta may not
21  enforce DSG's arbitration agreement.  Instead, further delay would only run contrary
22  to the "just, speedy, and inexpensive determination" required by the Rules Defendants
23  highlight.  *See* Mot., at 24 (quoting Fed. R. Civ. P. 1).  Defendants' request to upset the
24  Court's scheduling order and delay this action should be denied.

25  **IV.   CONCLUSION**

26             For the foregoing reasons, the Court should deny Defendants' motion.

27                                     Respectfully submitted,

28  Dated:  June 20, 2016              */s/ Paul A. Traina*

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

1

Walter J. Lack, Esq. (SBN 57550)
wlack@elllaw.com

2

Paul A. Traina, Esq. (SBN 155805)
ptraina@elllaw.com

3

Ian P. Samson, Esq. (SBN 279393)
isamson@elllaw.com

4

**ENGSTROM, LIPSCOMB & LACK**

5

A Professional Corporation
10100 Santa Monica Boulevard, 12th Floor

6

Los Angeles, California 90067-4113
Tel: (310) 552-3800 / Fax: (310) 552-9434

7

8

Brian J. Soo-Hoo, Esq. (SBN 228298)
soohoolaw@gmail.com

9

**LAW OFFICES OF BRIAN J. SOO-HOO**
601 Parkcenter Drive, Suite 105

10

Santa Ana, California 92705
Tel: (714) 589-2252 / Fax: (714) 589-2254

11

12

*Attorneys for Plaintiff and the Proposed Class*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION**

**CERTIFICATE OF SERVICE**

The foregoing Plaintiff's Opposition to Defendants' Motion to Compel Arbitration has been served via the Court's ECF system, which will send notification to counsel in this case.


Dated:  June 20, 2016                    ENGSTROM, LIPSCOMB & LACK


                                          */s/ Ian P. Samson*
                                          Ian P. Samson, Esq.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**