UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| PHILLIP NGHIEM,<br><br>           Plaintiff,<br><br>     v.<br><br>DICK'S SPORTING GOODS, INC. and ZETA INTERACTIVE CORPORATION,<br><br>           Defendants. | Case No.: SACV 16-00097-CJC(DFMx)<br><br>**ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION** |

## I. INTRODUCTION

Plaintiff Phillip Nghiem brings this action against Defendants Dick's Sporting Goods, Inc. ("DSG") and Zeta Interactive Corporation ("Zeta") for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.* (*See* Dkt. 1

-1-

["Compl."].)  Before the Court is DSG and Zeta's motion to compel arbitration.  For the following reasons, the motion is DENIED.[1]

## II. BACKGROUND

The Complaint alleges that DSG administers a marketing program centered on what they call "mobile alerts"—text messages sent to subscribers.  (Compl. ¶ 17.)  Consumers can sign up for mobile alerts on DSG's website or by sending a text message with the word "JOIN" to a number associated with DSG, called a "short code."  (*Id.*)  On May 4, 2015, Plaintiff enrolled in DSG's mobile alert program by texting the word "JOIN" to DSG's short code.  (*Id.* ¶ 21.)  Thereafter, on December 6, 2015, Plaintiff texted the word "Stop" to that same short code, indicating that he no longer wished to receive mobile alerts from DSG.  (*Id.* ¶ 22.)  DSG sent Plaintiff a text message indicating that he had unsubscribed and would no longer receive mobile alerts.  (*Id.*)

Despite this assurance, the Complaint alleges, DSG continued to send Plaintiff text messages, including on at least eight particular occasions between December 11, 2015 and January 22, 2016.  (*Id.* ¶ 24.)  Each of the eight messages was sent, Plaintiff says, by an automatic telephone dialing system after Plaintiff revoked his consent, in violation of the TCPA.  (*Id.* ¶¶ 23–24.)  The Complaint seeks statutory damages, treble damages, attorney's fees, and an order certifying a class.  (*See id.* at 9.)

On June 13, 2016, Defendants moved to compel arbitration, arguing that Plaintiff was on notice of the Terms of Use on DSG's website, which contain an arbitration agreement Defendants say cover the TCPA claims at issue.  Plaintiff insists that he was

---

[1] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for July 11, 2016 at 1:30 p.m. is hereby vacated and off calendar.

unaware of the arbitration agreement and had no reason to know of it. And even if he did agree to an arbitration agreement, Plaintiff says, the agreement did not cover TCPA claims, and the agreement cannot be enforced by third parties like Zeta.

## III. DISCUSSION

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "requires federal district courts to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). The FAA reflects both a "liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011); see also *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002) ("The [FAA] not only placed arbitration agreements on equal footing with other contracts, but also established a federal policy in favor of arbitration." (internal citation omitted)). The district court's role on a motion to compel arbitration is simply to determine whether a valid arbitration agreement exists and whether that agreement encompasses the claims at issue. *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1131 (9th Cir. 2000). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–24 (1983).

The arbitration agreement at issue here is contained within the Terms of Use that govern visitors to DSG's website. The Terms of Use constitute what is known as a "browsewrap agreement." As the Ninth Circuit has explained,

> Contracts formed on the Internet come primarily in two flavors: "clickwrap" (or "click-through") agreements, in which website users are required to click on an "agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions

of use are generally posted on the website via a hyperlink at the bottom of the screen.

*Nguyen*, 763 F.3d at 1175–76.  Browsewrap agreements "do[] not require the user to manifest assent to the terms and conditions [of a website] expressly." *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366–67 (E.D.N.Y. 2009).  Instead, the agreements purport to bind users simply by their existence, no matter whether the user has actually viewed them.  *See Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013) ("The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists.").

Because of this lack of assent on the part of consumers, courts enforce browsewrap agreements with "reluctance," *Nguyen*, 763 F.3d at 1178, and will generally only do so when a consumer has "actual or constructive knowledge of a website's terms and conditions," *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011).  In this case, Defendants argue that Plaintiff *both* had actual knowledge of, and constructive knowledge of, DSG's Terms of Use.

### A.  Actual Knowledge

Plaintiff avers in a declaration that he did not "investigate, 'carefully' or otherwise, DSG's website, terms of use, privacy policy, arbitration agreement, or class action waiver prior to joining DSG's mobile alerts program," that he "did not read or know about DSG's arbitration agreement," and that he only learned of that agreement when his counsel told him about it during this litigation.  (Dkt. 50-1 ["Nghiem Decl."] ¶ 9.)  He goes on to insist that he never "thought of" arbitration agreements when enrolling in DSG's program and that DSG never presented any arbitration agreement to him.  (*Id.*

¶ 10.) Defendants argue that this is false because Plaintiff is in fact a lawyer whose former firm routinely handles TCPA cases, including TCPA cases against DSG and its affiliates. (Dkt. 47-5 ["Baran Decl."] ¶ 3 (describing five demand letters sent by Plaintiff's former law firm to DSG and its subsidiary, Golf Galaxy, between March 10, 2015 and November 4, 2015).) As such, Defendants say, Plaintiff can be expected to have been familiar with DSG's arbitration agreement and have been fully aware of it when he enrolled in the mobile alerts program. (*See* Dkt. 47 ["Mot."] at 7 ("One can safely assume that Plaintiff and his direct supervising attorneys exhaustively reviewed DSG's website [in connection with prior demand letters].").) Defendants also provide evidence that Plaintiff enrolled in a number of text messaging programs in a short period of time—"fishing," Defendants say, for a TCPA lawsuit. (*See* Dkt. 47-2 ["Meyer Decl."].) For his part, Plaintiff declares that he "never worked on any matter, including any TCPA matter, involving DSG," and that while at his former firm, he "did not litigate as an attorney the enforceability of an arbitration clause in [any type of] matter, TCPA or otherwise." (Nghiem Decl. ¶ 15.)

These facts are insufficient to permit the Court to infer actual knowledge of the Terms of Use on Plaintiff's part. To be sure, as an attorney who sometimes litigates TCPA claims, Plaintiff surely has a greater level of understanding of the significance and prevalence of arbitration agreements. And Plaintiff *did* sign up for a significant number of mobile alerts programs within a few months. Nonetheless, actual knowledge is not something to be "safely assumed," as Defendants would have it, based on a plaintiff's occupation. Instead, Defendants were required to put forth "evidence" that Plaintiff had "actual knowledge of the agreement" at issue. *Nguyen*, 763 F.3d at 1177; *see also Van Tassell*, 795 F. Supp. 2d at 790–791 (requiring a "showing of actual knowledge of the terms by the webpage user"). Defendants' speculation regarding whether Nghiem

reviewed, at some point in the past, DSG's website Terms of Use is insufficient to meet this standard.[2]

### B. Constructive Knowledge/Inquiry Notice

The second situation in which a browsewrap agreement may bind a consumer is when a website "puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177. Whether a consumer is on such notice "depends on the design and content of the website and the agreement's webpage." *Id.* The "conspicuousness and placement" of a hyperlink to a website's terms of use, any "other notices given to users" of those terms, and the "website's general design" should all be consulted when determining whether a user is on inquiry notice of terms of use containing an arbitration agreement. *Id.* When a hyperlink to a website's terms is "buried at the bottom of the page or tucked away in obscure corners of the website," users cannot be said to be on constructive notice. *Id.* By contrast, when a website contains an "explicit textual notice that continued use will act as a manifestation of the user's intent to be bound" by terms and conditions, courts find users to have constructive or inquiry notice of those terms. *Id.*

Materials provided to the Court indicate that the hyperlink to DSG's Terms of Use appears "in the website footer" of DSG's home page, as well as its page containing information about its mobile app. (Kelly Decl. ¶ 13.) The link appears in a grouping of 27 other hyperlinks, arranged in four columns, that cover topics as diverse as "Careers," "Gift Cards," "Commercials & Films," and "Find a Store." (*Id.* Exh. A; *see also id.* Exh. D.) "Terms of Use" is sandwiched between "Only at DICK's" and "California

---

[2] Nor does Nghiem's occupation or litigation activity have any bearing on the question whether he was subject to inquiry notice of the Terms of Use, since that analysis asks whether a *reasonably prudent person*, not a person in a particular plaintiff's position, is on inquiry notice of a website's terms and conditions. *Nguyen*, 763 F.3d at 1177; *see also infra*, II.B.

Disclosures," near the bottom of the third column of links. (*Id.*) This placement is not conspicuous enough, alone, to put consumers on inquiry notice of the Terms of Use. Indeed, the hyperlink in *Nguyen*, which the Ninth Circuit held did *not* put users on inquiry notice, was considerably more conspicuous. It was placed "in the bottom left-hand corner of every page on the [defendant's] website" and was in "close proximity to the buttons a user must click on to complete an online purchase." *Nguyen*, 763 F.3d at 1178. In some cases, the hyperlink appeared "directly below the relevant button a user must click on to proceed in the checkout process," and in others, the content of the defendant's website was so compact that a user could view the link without being required to scroll to the bottom of the page. *Id.* Nonetheless, the Ninth Circuit concluded that the "proximity or conspicuousness of [a] hyperlink alone is not enough to give rise to constructive notice." *Id.* Instead, it held that

> where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.

*Id.* at 1178–79. Here, DSG does not point to any "notice to users" of the Terms of Use, nor does it allege that users of DSG's website were affirmatively required to accept the Terms of Use before completing certain functions. Accordingly, *Nguyen* controls, and DSG's website did not put consumers on inquiry notice of its Terms of Use.[3]

---

[3] Separately, Defendants argue that Plaintiff could not have learned of the keyword to join DSG's mobile alerts program without either clicking on "Text Alerts," one of the 27 hyperlinks that accompanied "Terms of Use" at the bottom of DSG's web page, or clicking the "Mobile Alerts" link which appears approximately two inches above the Terms of Use hyperlink. This may be so—in fact the parties dispute whether the keyword was available elsewhere—but even assuming Defendants are correct, this argument does not save their motion. As discussed *supra*, close proximity of a terms and conditions hyperlink to buttons consumers are required to click does not, without more, put consumers on inquiry notice of those terms. *Nguyen*, 763 F.3d at 1178–89.

As the Court has concluded that Plaintiff neither had actual knowledge of the Terms of Use, nor was on inquiry notice of those terms, he cannot be bound by the arbitration clause contained in DSG's browsewrap agreement. Defendants' motion to compel arbitration is therefore DENIED.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration is DENIED.

DATED: July 5, 2016

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE